GARRICK A. HOLLANDER -- State Bar No. 166316
ghollander@winthropcouchot.com
PETER W. LIANIDES – State Bar No. 160517
plianides@winthropcouchot.com
JEANNIE KIM – State Bar No. 270713
jkim@winthropcouchot.com
**WINTHROP COUCHOT
PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111

[Proposed] General Insolvency Counsel for
Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### RIVERSIDE DIVISION

| | |
|---|---|
| In re | Case No. 6:16-bk-10096 WJ |
| METROPOLITAN AUTOMOTIVE WAREHOUSE, INC., a California corporation,<br><br>Debtor and<br>Debtor-in-Possession. | Chapter 11 Proceeding<br><br>**DEBTOR'S <u>EMERGENCY</u> MOTION FOR ORDER AUTHORIZING DEBTOR TO ENTER INTO SUPPLY AGREEMENT PURSUANT TO 11 U.S.C. § 363(b), AND TO OBTAIN CREDIT PURSUANT TO 11 U.S.C. § 364(d); MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[DECLARATION OF RONALD TURNER FILED CONCURRENTLY HEREWITH]<br><br>DATE:      January 20, 2016<br>TIME:      3:00 p.m.<br>PLACE:    Courtroom 304<br>                  3420 Twelfth Street<br>                  Riverside, California 92501 |

216336

**TO THE HONORABLE WAYNE E. JOHNSON, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND PARTIES-IN-INTEREST:**

Metropolitan Automotive Warehouse, Inc., a California corporation and the debtor and debtor-in-possession in the above captioned Chapter 11 proceeding ("Debtor-Metro"), and Star Auto Parts, Inc., a California corporation and the debtor and debtor-in-possession in the Chapter 11 proceeding styled *In re Star Auto Parts, Inc.* (Case no. 6:16-bk-10105 WJ) ("Debtor-Star," and together with Debtor-Metro, collectively, the "Debtors")[1] hereby move ("Motion") the Court, on an emergency basis, for an order (i) authorizing the Debtors to enter into that certain Inventory Supply Agreement ("Supply Agreement") with Elliot Auto Supply Co., Inc., d/b/a/ Factory Motor parts, a Minnesota corporation ("FMP"), pursuant to 11 U.S.C. § 363(b), and (ii) to obtain credit from FMP in connection therewith, pursuant to 11 U.S.C. § 364(d).  The Debtors request that the Court grant the Motion on an *interim* basis at the emergency hearing on January 20, 2016, and to set a further final hearing on the Motion.

This Motion is made and based upon the foregoing allegations and representations, the Memorandum of Points and Authorities and the Declaration of Ronald Turner in support of the Motion ("Turner Declaration") filed concurrently herewith, the papers, pleadings and other documents on file in the Debtors' Chapter 11 case, and upon such other evidence, both oral and documentary, that may be submitted to the Court at or before the time of the hearing on this Motion.

WHEREFORE, the Debtors request that this Court enter its order:

      1.      Authorizing the Debtors to enter into that certain Supply Agreement with FMP pursuant to 11 U.S.C. § 363(b);

---

[1] The Debtors have filed substantially identical motions in their respective cases.  On January 7, 2016, the Debtors each filed in their respective cases the *Debtor's Ex Parte Motion for Order Authorizing Joint Administration of Related Chapter 11 Cases* [*In re Metropolitan Automotive Warehouse, Inc.*, Case no. 6:16-bk-10096 WJ, Docket no. 6; *In re Star Auto Parts, Inc.*, Case no. 6:16-bk-10105 WJ, Docket no. 4] (collectively, the "Joint Administration Motions").  The Joint Administration Motions currently are set for hearing on January 20, 2016, at 3:00 p.m.

-2-

216246

1        2.      Authorizing the Debtors to obtain credit from FMP in connection therewith,

2 pursuant to 11 U.S.C. § 364(d);

3        3.      In the alternative, to the extent the Debtors are able to negotiate DIP

4 financing with another party on superior terms, and subject to the consent of the Bank of

5 the West, the Debtors reserve the right to seek approval of such alternative transaction; and

6        4.      Granting such other and further relief as may be just and appropriate in

7 accordance with the circumstances of this case.

8 DATED: January 15, 2016              **WINTHROP COUCHOT**

9                            **PROFESSIONAL CORPORATION**

10                      By:    /s/ *Garrick A. Hollander*

11                            Garrick A. Hollander

                           Peter W. Lianides

12                            Jeannie Kim

                           [Proposed] General Insolvency Counsel for Debtor

13                            and Debtor-in-Possession

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

The Debtors' 60 year old family business employs approximately 1,000 employees in its $250 million business.  The Debtors anticipate that they will seek to sell substantially all of their assets pursuant to a sale under Section 363 of the Bankruptcy Code.

While the Debtors have obtained court approval for the interim use of cash collateral to pay their current obligations, the Debtors are in need new inventory in order to maintain their going concern value pending the anticipated sale.  Obtaining new inventory is absolutely essentially to preserving the Debtors' going concern value.  Without new inventory, the Debtors' sales revenue will drop precipitously and ultimately force the Debtors to close operations.

The replenishment of inventory is critical to the continued operation of the Debtors as a going concern and thereby maximizing the value achievable in a sale transaction for the benefit of all creditors.  The Debtors have not received significant deliveries of inventory for approximately five (5) weeks.  The warehouses and stores are stocked out of several fast-moving SKUs demanded by the Debtors' customers.  Without new inventory, the Debtors risks further declining sales, customer flight, and loss of key sales personnel.  Absent the ability to acquire new inventory, the Debtors will effectively be self-liquidating their current inventory, likely resulting in irreparable loss of any enterprise value above and beyond liquidation value of the Debtors' assets.

One of the potential stalking horse bidders, FMP, has agreed to provide new inventory to the Debtors on credit pending a sale pursuant to the Supply Agreement.  An initial draft of the Supply Agreement is attached to the Turner Declaration as exhibit 1.  This initial draft will be revised because certain provisions are inconsistent with among other things, the Intercreditor Agreement with the Bank.  However, a revised draft of the Supply Agreement was not available by the time of the deadline for the filing of this Motion.  Accordingly, the Debtors anticipate that a revised draft of the Supply Agreement will be filed prior to the hearing.

1      FMP has agreed to provide approximately $2 to $2.5 million in inventory ("FMP

2    Inventory") per week to the Debtors, and will have a first priority lien on the FMP Inventory and

3    any proceeds thereof.  As set forth in more detail below, FMP will be repaid a portion of the

4    proceeds upon the sale of such Inventory.

5      The Debtors project the ability to sell approximately $7 million of inventory received from

6    FMP in the month of February and another $10 million in March.  Collectively, this projected $17

7    million of sales are estimated to generate approximately $2.7 million in gross profit for the benefit

8    of the estates.  Further, the restored ability to offer a full line of products to customers will support

9    the continued normal course operation of the Debtors, preserving going-concern enterprise value

10    for the benefit of all stakeholders.

11      At this time, no other form of DIP financing is available to the Debtors.  The Debtors'

12    senior lender Bank of the West has consented to the use of cash collateral, but has not offered to

13    extend incremental financing.  Further, Bank of the West requires that the Debtors remain in

14    compliance with a weekly borrowing base test, which will result in the significant pay down of the

15    facility balance as current inventory is sold and accounts receivable collected.  Further, the Supply

16    Agreement will provide for the near-immediate inflow of inventory, saving the time and resources

17    that would be required to procure inventory on a vendor-by-vendor basis, even in the event that the

18    Debtors did have access to traditional DIP financing.

19      Bank of the West has consented to the proposed transaction with FMP, and, in fact, has

20    entered or is in the process of entering into a *Subordination and Intercreditor Agreement*

21    ("Intercreditor Agreement") with FMP which will govern the relative priority of their respective

22    liens.

23      The Debtors request that the Court hear and grant this Motion on an interim basis at the

24    emergency hearing, and set a final hearing thereafter.

25

26

27

28

## II.

## STATEMENT OF FACTS

### A.      General Description of the Debtor

The Debtor is a family-owned Southern California-based business, distributing aftermarket automotive parts for the last sixty years, with operations in southern California and central California.  The Debtor distributes aftermarket automotive parts to retail stores and also sells to, and fulfills orders for, various e-commerce customers.  Star Auto Parts, Inc. ("Debtor-Star"), a California corporation and wholly-owned subsidiary of the Debtor, also is a Southern California based retailer of aftermarket automotive parts.  Debtor-Star sells aftermarket automotive parts directly to repair facilities also known as the "Do-it-for-Me" channel, end users, also known as the "Do-it-Yourself" channel, and businesses that own and operate vehicle fleets.  The Debtor and Debtor-Star (collectively, the "Debtors") employ approximately 1,000 employees.

### B.      Financial Performance of the Debtors

The Debtors generated sales of approximately $225 million and $206 million each of the years ending 2015 and 2014, respectively; while generating a net loss of approximately $4 million and net income of approximately $1 million in each of the years ending 2015 and 2014, respectively.

### C.      Events Precipitating Chapter 11 Filings

The Debtors grew very rapidly from 2009 through 2015 following the bankruptcy of Pacific Supply, the company's largest competitor, which, at the time, was based in Long Beach, California.  As a result of growing demand during this timeframe, the Debtors expanded operations from one distribution center and eight retail stores in 2009 to five distribution centers and nine retail stores in 2015, as well as launched a business to support a growing list of e-commerce customers across all five distribution centers.  Due to the need to provide high service levels seven days per week and to compete aggressively to maintain and grow its e-commerce business, the business experienced rising operating costs and falling margins leading to operating losses and cash flow issues.

Recently, one of the Debtors' largest unsecured trade creditors filed an action to recover on

its claim.  As part of this effort, this creditor filed a motion to appoint a Federal Court receiver in Michigan.  The Michigan court scheduled a hearing to discuss this motion for January 7, 2016.  In order to stave off the potential appointment of a receiver, the Debtors filed for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on January 6, 2016 (the "Petition Date").

### D.    Secured Claims Asserted Against Debtors' Cash Collateral

Bank of West (the "Bank") is the Debtors' primary secured creditor.  The Bank is also the only creditor that holds lien rights against the Debtors' "cash collateral" as that term is defined in Section 363(a) of the Bankruptcy Code.  Currently, the Debtors owe the Bank approximately $24 million pursuant to a line of credit (the "Line of Credit").

The Bank represents that the Line of Credit is evidenced by, inter alia: (i) that certain "Loan And Security Agreement" dated as of June 8, 2012 (as amended, modified or supplemented from time to time, the "Loan Agreement"); (ii) that certain "Amended And Restated Accounts Receivable Line Of Credit" dated as of February 20, 2015 in the original principal amount of $28,000,000.00 (as amended, modified or supplemented from time to time, the "Note"); and (iii) all security agreements, UCC financing statements, and all other documents, instruments, and agreements executed in connection with the Line of Credit (collectively, with the Loan Agreement and the Note, the "Primary Lender Documents").

The Bank presents that the Line of Credit is secured by a first-priority lien on substantially all of Borrowers' personal property assets, including, but not limited to, all of Borrowers' accounts, accounts receivable, inventory, general intangibles, machinery, equipment, chattel paper, and all proceeds thereof, whether presently existing or hereafter acquired (all as more particularly described in the Primary Lender Documents, the "Primary Lender Collateral").

### E.    The Proposed Agreements with FMP.

While the Debtors have obtained use of cash collateral to pay current obligations, the Debtors are in need new inventory in order to maintain their going concern value pending the anticipated sale.  Obtaining new inventory is absolutely essentially to preserving the Debtors'

going concern value.  Without new inventory, the Debtors' sales revenue will drop precipitously and ultimately force the Debtors to close operations.

One of the potential stalking horse bidders, FMP, has agreed to provide new inventory to the Debtors on credit pending a sale pursuant to the Inventory Supply Agreement ("Supply Agreement") and Security Agreement.  An initial draft of the Supply Agreement is attached to the Turner Declaration as exhibit 1.  This initial draft will be revised in at least two respects (1) the timing of the repayment will be revised to be consistent with the Intercreditor Agreement; and (2) the interest/fee provision in the initial draft is inconsistent with the terms negotiated between the parties and will be revised to an amount no greater than 13%.  However, a revised draft of the Supply Agreement was not available by the time of the deadline for the filing of this Motion.  Accordingly, the Debtors anticipate that a revised draft of the Supply Agreement will be filed prior to the hearing.

FMP will provide approximately $2 to $2.5 million in inventory ("FMP Inventory") per week to the Debtors, and will have a first priority lien on the FMP Inventory and the proceeds thereof.  Payment for the FMP Inventory will be due upon collection by the Debtor on sales of FMP Inventory.

The Debtors project the ability to sell approximately $7 million of inventory received from FMP in the month of February and another $10 million in March.  Collectively, this projected $17 million of sales are estimated to generate approximately $2.7 million in gross profit for the benefit of the estates.  Further, the restored ability to offer a full line of products to customers will support the continued normal course operation of the Debtors, preserving going-concern enterprise value for the benefit of all stakeholders.

The Debtors' primary secured lender, Bank of the West, has consented to the proposed transaction with FMP, and, in fact, has or is in the process on entering into a *Subordination and Intercreditor Agreement* ("Intercreditor Agreement") with FMP which will govern the relative priority of their respective liens.  The Debtors have a draft Intercreditor Agreement with *inter alia* provides:

E.        FMP is considering a purchase of certain assets of [the Debtors]. FMP is also willing, in its sole and absolute discretion and pursuant to terms negotiated by and between FMP and [the Debtors], to supply [the Debtors] with finished inventory (the "**FMP Inventory**"), on credit, for resale by [the Debtors] in the ordinary course of [the Debtors'] business (the "**FMP Inventory Financing**").

F. As a condition precedent to supplying [the Debtors] with the FMP Inventory, FMP requires that it obtain a first-priority security interest in all FMP Inventory sold and delivered to [the Debtors], as well as all cash proceeds, accounts receivable, general intangibles and other proceeds of the FMP Inventory, including, without limitation, any cash proceeds deposited in a deposit account maintained with [Bank] or in a deposit account maintained at another financial institution if [Bank] has control of that deposit account (collectively, the **FMP Collateral**") in amounts necessary to repay FMP for the value, at [the Debtors'] "cost", of all FMP Inventory Financing provided to [the Debtors].

G. Absent the terms of this Agreement, the FMP Collateral would constitute a portion of the Primary Lender Collateral and, therefore, subject to [Bank's] senior lien. For this reason, [Bank] is willing to subordinate its existing first-priority security interest in the FMP Collateral only in accordance with the terms and conditions of this Agreement.

See Intercreditor Agreement, ¶¶ E-G.

Thus, the Bank will have the first, senior and superior lien upon the Primary Lender Collateral and all proceeds thereof, in whatever form; and FMP will have the first, senior and superior lien upon the FMP Collateral and all proceeds thereof, in whatever form.

FMP will be repaid a portion of the proceeds upon the sale of the FMP Inventory in the amount of the Debtors' cost, on an item by item basis, of the FMP Inventory.

The Intercreditor Agreement provides examples to illustrate the covenants and agreements of FMP and the Bank:

- If FMP sells and delivers to Debtors an item of inventory at Debtors' cost of $100.00, and Debtors subsequently sell the item for $130.00 in cash, FMP will be entitled to $100.00 in cash, and the Bank will be entitled to $30.00. In this example, the $100.00 in cash proceeds shall constitute a portion of the FMP Collateral for which FMP will have the senior lien, and the $30.00 in cash proceeds shall constitute a portion of the Primary Lender Collateral.

- If FMP sells and delivers to the Debtors an item of inventory at Debtors' cost of $100.00, and Debtors subsequently sell the item for $130.00, with payment over

1    time, the account receivable generated thereby shall constitute a portion of the FMP

2    Collateral for which FMP will have the senior lien. Once this account receivable is

3    collected, FMP will be entitled to $100.00 in cash, and the Bank will be entitled to

4    $30.00.

5    • Any inventory, cash, accounts receivable collections or other assets of Debtors

6    which did not arise from the FMP Inventory Financing (either because it was a pre-

7    existing asset of Debtors or is acquired from a supplier other than FMP) shall

8    continue to constitute the Primary Lender Collateral, and FMP shall not have any

9    rights in said assets, or any proceeds thereof.

10    The Debtors, the Bank and FMP are all in agreement that the proposed supply agreement

11    and financing associated therewith is absolutely necessary to preserve the going concern value of

12    the Debtors pending the anticipated sale. Accordingly, the Debtors respectfully request that the

13    Court grant the relief requested herein.

14    **III.**

15    **THE COURT SHOULD APPROVE THE POSTPETITION SUPPLY AGREEMENT**

16    **THE COURT MAY APPROVE POST-PETITION TRANSACTION**

17    Section 363 of the Bankruptcy Code provides that only transactions *outside* the ordinary

18    course of business require court approval.

19    (b)(1) The trustee, after notice and a hearing, may use, sell, or lease, *other
than* in the ordinary course of business, property of the estate.  ***

20    11 U.S.C. § 363(b)(1).

21    Transactions which are not within the "ordinary course of business" may be approved as

22    within the reasonable business judgment of the Debtor. The Debtor has the authority to operate

23    his business under 11 U.S.C. §§ 1107 and 1108. "[A] Chapter 11 debtor should be given every

24    opportunity afforded it under the bankruptcy laws to take advantage of the 'optimum environment

25    for rehabilitation' without unnecessary interruption of its business." In re Air Vectors Associates,

26    53 B.R. 668, 686-687 (Bankr.S.D.N.Y. 1985) citing B. Weintraub & A. Resnick, Bankruptcy Law

27    Manual ¶ 8.11[1] at 8-23 (1980). See also Lebbos v. Schuette, 2008 WL 5103200, at *5 (E.D.

28

1  Cal. Dec. 2, 2008) ("the position of the trustee is afforded deference, particularly where business

2  judgment is entailed in the analysis").

3      "So long as a trustee conducts the affairs of the estate by exercising his business judgment

4  in good faith, upon a reasonable basis, and within the scope of his authority under the Code, he

5  may proceed without interference." In re Consolidated Auto Recyclers, Inc., 123 B.R. 130, 140

6  (Bankr.D.Me. 1991). Cf. Bennett v. Williams, 892 F.2d 822, 824 (9th Cir.1989) (deference to

7  business management decisions of bankruptcy trustee).

8      In examining business transactions, the Court employs a deferential "business judgment"

9  rule. "Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in

10  question should be approved under section 363(b)(1)." In re Dura Auto. Sys., Inc., 2007 WL

11  7728109, at *92 (Bankr. D. Del. Aug. 15, 2007). "A debtor-in-possession is accorded great

12  deference as to its business judgments." In re Girard Medical Center, 1990 WL 56486, *2

13  (Bankr.E.D.Pa. 1990).  See also In re Wheeling-Pittsburgh Steel Corp., 72 B.R. 845, 849

14  (Bankr.W.D.Pa. 1987) ("courts accord the debtor's business judgment a great amount of

15  deference").

16      The business judgment rule:
17      ... refers to a judicial policy of deference to the business judgment of corporate
        directors in the exercise of their broad discretion in making corporate decisions.
18      The business judgment rule is premised on the notion that those to whom the
        management of the corporation has been entrusted, and not the courts, are best able
19      to judge [the wisdom of] ... a particular act or transaction ... and establishes a
20      presumption that directors' decisions are based on sound business judgment.

21  In re Tran-Action Commerical Inv'rs, Ltd., 2002 WL 32341923, at *21 (Bankr. N.D. Cal. June 28,

22  2002) quoting Gaillard v. Natomas Co., 208 Cal.App.3d 1250, 1263, 256 Cal.Rptr. 702 (1989).

23      As a debtor-in-possession, [debtor] has authority to operate the business. 11
        U.S.C. § 1108.  The authority to operate that business necessarily includes the
24      concomitant discretion to exercise reasonable judgment in ordinary business matters.
        In re Columbia Motor Express, Inc., 33 B.R. 389 (D.C.M.D.Tenn.1983).  The
25      business of this debtor-in-possession includes oil and gas drilling operations.
        [Debtor's] best business judgment indicates these drilling operations are necessary
26      and reasonable for the benefit of the estate.  The discretion to act with regard to
        business planning activities is at the heart of the debtor's power. In re DeLuca
27      Distributing Co., 38 B.R. 588 (Bankr.N.D.Ohio 1984). In exercising [debtor's]
28      business judgment of conducting its drilling operations, it has found it necessary to

obtain loans to make these endeavors possible.  This is in accordance with the exercise of its sound business discretion.

**Business judgments should be left to the board room and not to this Court**.  Matter of Lifeguard Industries, Inc., 37 B.R. 3 (Bankr.S.D.Ohio 1983). **Only in circumstances where there are allegations of, and a real potential for, abuse by corporate insiders should the Court scrutinize the actions of the corporation**.  Id.  See also, In re Lyon and Reboli, Inc., 24 B.R. 152 (Bankr.E.D.N.Y.1982).  There are no allegations of insider abuse in this case.

In re Simasko Production Co., 47 B.R. 444, 449 (Bankr.D.Colo. 1985) (emphasis added).  See also In re Curlew Valley Associates, 14 B.R. 506, 513-514 (Bankr.D.Utah 1981) ("the court will not entertain objections to a trustee's conduct of the estate where that conduct involves a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code."); Frostbaum v. Ochs, 277 B.R. 470, 475 (E.D.N.Y. 2002) ("So long as this decision was not made arbitrarily, or in bad faith, it was appropriate for the Bankruptcy Court to accept this decision for the benefit of the estate"); In re Thinking Machs. Corp., 182 B.R. 365, 368 (D.Mass.) (emphasizing "the high degree of deference usually afforded purely economic decisions of trustees", *rev'd on other grounds*, 67 F.3d 1021 (1st Cir.1995); In re JFD Enterprises, Inc., 215 F.3d 1312, 2000 WL 560189, *5 (1st Cir. 2000) ("the trustee's business judgment is subject to great judicial deference").

Here, the Debtors' entry into the supply agreement is within the Debtors' reasonable business judgment.  The Debtors are in critical need new inventory in order to maintain their going concern value pending the anticipated sale.  Without new inventory, the Debtors' sales revenue will drop precipitously and ultimately force the Debtors to close operations.

FMP has agreed to provide new inventory to the Debtors on credit pending a sale.  FMP will provide approximately $2 to $2.5 million in FMP Inventory per week to the Debtors, and will have a first priority lien on the FMP Inventory and the proceeds thereof.  As set forth above, the Debtors project the ability to sell approximately $7 million of inventory received from FMP in the month of February and another $10 million in March.  Collectively, this projected $17 million of sales are estimated to generate approximately $2.7 million in gross profit for the benefit of the estates.  Further, the restored ability to offer a full line of products to customers will support the

1  continued normal course operation of the Debtors, preserving going-concern enterprise value for

2  the benefit of all stakeholders.

3      Since approval of the transaction is absolutely necessary to maintain the Debtors'

4  operations and going concern, the Debtors respectfully submit that the transaction is within the

5  Debtors' reasonable business judgment.

6                                 **III.**

7  **THE DEBTORS SHOULD BE AUTHORIZED TO OBTAIN CREDIT IN**

8  **CONNECTION WITH THE SUPPLY AGREEMENT PURSUANT TO 11 U.S.C. § 364(d)**

9      Section 364(d)(1) of Bankruptcy Code empowers a bankruptcy court to authorize a debtor to

10  obtain postpetition financing secured by a senior lien against property of the estate.

11      (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or
the incurring of debt secured by a senior or equal lien on property of the estate that
12  is subject to a lien only if--
        (A) the trustee is unable to obtain such credit otherwise; and
13      (B) there is adequate protection of the interest of the holder of the lien on the
property of the estate on which such senior or equal lien is proposed to be granted.
14

15  11 U.S.C. §364(c)(1) and (d)(1).  *See also* Federal Rule of Bankruptcy Procedure 4001(c)

16  (authorizing court to approve consensual arrangements for the obtaining of credit by a debtor

17  contemplated by Bankruptcy Code § 364.)

18      The Sixth Circuit Court of Appeals, in In re Ellingsen MacLean Oil Co., Inc., 834 F.2d 599

19  (6th Cir. 1987), cert. denied, 488 U.S. 817, 109 S. Ct. 55, 102 L. Ed. 2d 33 (1988) succinctly stated

20  the purpose of Section 364 as follows:

21      There are countervailing strong policy reasons to encourage creditors to
extend additional post petition credit to debtors.  Chapter 11 envisions the
22  continued operation of a debtor's business, but the need for fresh capital and
difficulties in obtaining the capital and wherewithal to run a business are
23  obvious.  Lenders and suppliers are understandably reluctant to do business
with a debtor who is in bankruptcy and who may have few, if any,
24  unencumbered assets to offer as collateral.  Section 364 is designed to
encourage post-petition financing by authorizing security in the debtor's
25  assets and giving the lender priority over administration costs.

26

27  Id. at 603.

28

**A)    The Debtors have been Unable to Obtain Appropriate Financing, Contemplated under The Joint Plan, by Any Other Means.**

The first prong of Section 364(d)(1) requires that the Debtors establish that they are unable to obtain such credit otherwise. Section 364(d)(1)(A) require the following showing:

> To meet the requirement of 11 USCA § 364(d)(1)(A) of demonstrating that the estate is unable to obtain credit other than by granting a superpriority lien on encumbered property, it is not necessary for the representative of the estate to contact every possible lender. It suffices for the trustee or debtor in possession to demonstrate that he or she has made an unsuccessful, but good-faith effort to obtain less onerous financing by contacting at least several available lending institutions. The fact that the trustee could have obtained a small, unsecured loan elsewhere does not indicate that he or she could obtain the amount needed without granting a superpriority lien.

9B Am. Jur. 2d Bankruptcy § 1561 (2006). See also In re Reading Tube Industries, 72 B.R. 329, 332 (Bankr.E.D.Pa. 1987) ("The first prong requires the debtor to demonstrate that less onerous post-petition financing was unavailable."); In re Snowshoe Co., Inc., 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable.")

In Matter of Stanley Hotel, Inc., 15 B.R. 660, 663 (D.Colo. 1981), the District Court affirmed the Bankruptcy Court's order approving senior secured financing under Section 364(d)(1). The Court held that § 364(d)(1)(A) was satisfied where at least two banks had "refused to grant unsecured loans". Moreover, the mere fact that the estate may have been able to obtain a small unsecured loan did not indicate that the estate could have obtained a sufficient loan amount at issue without granting a senior lien.

> [T]he appellants' claim that the trustee could have obtained credit elsewhere, since Club Holiday granted the trustee a $50,000 unsecured loan in conjunction with the purchase agreement of February 18, 1981, is without merit. ... [T]he mere fact that the trustee may have been able to obtain a $50,000 unsecured loan does not indicate that he could have obtained the $700,000 amount at issue without granting a senior lien.

Matter of Stanley Hotel, Inc., 15 B.R. 660, 663 (D.Colo. 1981).

Here, the Debtors were "unable otherwise to obtain sufficient credit on terms equal to or more favorable than the terms set forth in [Credit Agreement]." In re Defender Drug Stores, Inc.,

1    126 B.R. 76, 79 (Bankr.D.Ariz. 1991).  See also In re Qualitech Steel Corp., 2003 WL 21314073,

2    *3 (S.D.Ind. 2003)[2] ("Under the circumstances, no other source of financing exists, on terms more

3    favorable than those offered by the Banks.")

4            Accordingly, courts accept as sufficient evidence that the Debtors contact two to four

5    potential lenders, in order to satisfy Section 364(d)(1)(A).  See In re Sky Valley, Inc.  100 B.R.

6    107, 113 (Bankr.N.D.Ga. 1988) (Debtor approached 4 potential lenders was sufficient); In re Ames

7    Dept. Stores, Inc., 115 B.R. 34, 40 (Bankr.S.D.N.Y. 1990) ("Debtors contacted four lenders ... this

8    Court is satisfied that the Debtors have demonstrated the unavailability of unsecured financing").

9    See also In re Reading Tube Industries, 72 B.R. 329, 332 (Bankr.E.D.Pa. 1987) ("Courts have

10    found ... 2 attempts to be sufficient under the particular circumstances of each case").

11            As forth in the Turner Declaration, the financing proposed herein is the result of a

12    significant amount of determined effort by the Debtors, and it represents the most favorable

13    financing currently available.  The Debtors were unable to obtain more favorable financing terms

14    from any other source, including other potential bidders for the Debtors' assets.  The Debtors have

15    been in negotiations with several potential purchasers of the Debtors' assets, and remains in the

16    process of selecting a stalking horse bidder.  The Debtors have been in discussions with at least

17    three (3) other potential bidders who have expressed some interest in extending credit.  However,

18    the Debtors have been unable to come to any agreement to date, on more favorable financing

19    terms.  Moreover, to the best of the Debtors' knowledge, none of the other potential bidders

20    negotiated any kind of inter-creditor agreement with the Bank.  The Debtors simply do not have the

21    luxury of time to wait for another deal to materialize.  However, the Debtors continue to receive

22    interest from these parties regarding potential DIP financing.  Accordingly, to the extent the

23    Debtors are able to negotiate financing with another party on superior terms, and subject to the

24    consent of the Bank, on or before the hearing, the Debtors reserve the right to seek approval of

25    such alternative transaction.

26            The Debtors have also been in contact with at least four (4) separate traditional DIP

27

28    _____
      [2] *Reversed on other grounds* Mellon Bank, N.A. v. Dick Corp., 351 F.3d 290 (7th Cir. 2003).

1    lenders.  These traditional DIP lenders have refused to extend credit on equal or more favorable

2    terms in particular because (i) they are unwilling to extend credit on a junior secured basis, and the

3    Bank will not subordinate its current first priority lien to a blanket lien in favor of a DIP Lender,

4    and (2) their DIP financing would not be associated with a stalking horse bid.

5        In addition, the Debtors attempted but were unable to obtain more favorable financing

6    terms from the Bank itself.  The Bank has indicated it prefers that the Debtors obtain additional

7    credit from a third party source, such as FMP.  Accordingly, as long as the Debtors have the ability

8    to obtain credit from FMP, the Bank will not extend any additional credit let along credit on more

9    favorable terms.

10       Accordingly, the Debtors respectfully submit that, at the present time, they are unable to

11   obtain comparable credit on terms more favorable than the proposed financing from FMP.

12   **B)    No Showing of Adequate Protection is Necessary as Bank of the West has**

13   **Consented to the Proposed Transaction.**

14       The second prong of 11 U.S.C. § 364(d)(1) requires a debtor to show that the interests of

15   the holder of an existing lien on the property are adequately protected.

16       A creditor only has standing to assert a lack of adequate protection of *its* security interest.

17   An objector lacks standing to assert a lack of adequate protection on behalf of some other party's

18   interest.  See In re Sky Valley, Inc., 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988)[3] ("Anchor Bank

19   lacks standing, however, to argue [a lack of adequate protection] on behalf of the other

20   lienholders who, after due notice and an opportunity to be heard, either never objected or filed

21   objection to Debtor's motion and withdrew them during the hearings."); In re Seatco, Inc., 257

22   B.R. 469, 478 fn 3 (Bankr. N.D. Tex.) opinion modified on reconsideration, 259 B.R. 279 (Bankr.

23   N.D. Tex. 2001) (creditor had no standing to assert objection "on behalf of other creditors").

24       As a result, the Debtors need not establish adequate protection of a secured creditor's

25   interest under Section 364(d), if such creditor consents or otherwise fails to oppose the Motion.

26   The court in Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 122 (N.D.Ga. 1989), held

27

28   [3] aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117 (N.D. Ga. 1989)

that the debtor is relieved of any burden to establish adequate protection where the existing

lienholder does not object and/or withdraws such objection:

> [W]hile § 364(d)(2) clearly puts the burden on the debtor-in-possession to
> demonstrate that there is adequate protection of the primed lienholder, the
> section is silent as to whether a lienholder may waive the protection. In the
> instant case, **the bankruptcy court considered the adequate protection only
> of the lienholder which objected to the new senior lien**, holding that Anchor
> lacked standing to argue the adequate protection, vel non, of the undersecured
> lienholders who withdrew their objections to the superpriority lien.
> Admittedly, because the junior lienholders are already undercollateralized, the
> authorization of superpriority financing makes their positions even more
> vulnerable. Each creditor, however, is entitled to seek its own best interest,
> within the strictures of the bankruptcy code. The fact that those undersecured
> lienholders either did not object or withdrew their objections to the
> superpriority financing must mean that they expect to derive some benefit from
> the transaction. Perhaps each concluded that the superpriority lien would help
> bring about a successful reorganization or at least increase the value of the
> collateral, ultimately increasing the amount each will receive on its
> undersecured claim. The court need not speculate; **by tacitly consenting to
> the superpriority lien, those creditors relieved the debtor of having to
> demonstrate that they were adequately protected**.

Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. at 122;  Bland v. Farmworker Creditors, 308

B.R. 109, 113 (S.D. Ga. 2003) quoting 2C Bankr.Service L.Ed. § 20:380 (Nov.2003)

("Undersecured lienholders, by tacitly consenting to superpriority lien by either not objecting or

withdrawing their objections to superpriority financing under 11 U.S.C.A. § 364(d), relieved

debtor of having to demonstrate that they were adequately protected."); James Buchwalter,

Construction and Application of Bankruptcy "Superpriority Lien" or "Priming Lien" Provision, 11

U.S.C.A. § 364(d), 63 A.L.R. Fed. 2d 563 (2012) ("Undersecured creditors may relieve the debtor

of having to demonstrate that they were adequately protected by tacitly consenting to a

superpriority lien that the debtor seeks under 11 U.S.C.A. § 364(d).")

Accordingly, here, the Debtors are relieved of any burden to establish adequate protection

of the interests of the Bank who has consented to the transaction.

**C)    Bank of the West's Interests Will Remain Adequately Protected by a
Substantial Equity Cushion.**

Even assuming *arguendo* that the Bank had not consented to the proposed financing under

1    11 U.S.C. § 364(d), their interest in collateral is "adequately protected" by a substantial equity

2    cushion.   Pursuant to Section 364(d)(1), the court may authorize "the incurring of debt secured by

3    a senior ... lien on property of the estate that is subject to a lien" if "there is adequate protection of

4    the interest of the holder of the lien on the property of the estate on which such senior or equal lien

5    is proposed to be granted."  11 U.S.C. § 364(d)(1).

6        It is well established that an equity cushion constitutes adequate protection for the purposes

7    of Section 364(d)(1).  "The existing of an equity cushion seems to be 'the preferred test in

8    determining whether priming of a senior lien is appropriate under section 364.'" In re YL W. 87th

9    Holdings I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) quoting In re Strug–Div., LLC, 380

10   B.R. 505, 513 (Bankr.Ill.2008).

11       The Ninth Circuit in In re Mellor, 734 F.2d 1396, 1401 (9th Cir. 1984), established that an

12   equity cushion in the range of 10% to 20% constitutes adequate protection of the secured

13   creditors' interest in the collateral.

14       Although the existence of an equity cushion as a method of adequate protection is
         not specifically mentioned in § 361, it is the classic form of protection for a secured
         debt justifying the restraint of lien enforcement by a bankruptcy court. In fact, it has
15       been held that **the existence of an equity cushion, standing alone, can provide
         adequate protection**.  A sufficient equity cushion has been found to exist although
16       not a single mortgage payment had been made.  *** The bankruptcy court found
         that the value of the residence is $105,000; thus, there is an "equity cushion" to
17       protect the sellers' interest in the amount of $20,340 or approximately 20% of the
         total value.  **A 20% cushion has been held to be an adequate protection for a
18       secured creditor**. See In re McGowan, 6 B.R. 241, 243 (B.Ct.E.D.Pa.1980)
         [**holding a 10% cushion is sufficient to be adequate protection**]; In re Rogers
19       Development Corp., 2 B.R. 679, 685 (B.Ct.E.D.Virg. 1980) [**court decided that an
         equity cushion of approximately 15% to 20% was sufficient adequate
20       protection to the creditor, even though the debtors had no equity in the
         property**.]; In re Breuer, 4 B.R. 499, 501 [creditor protected by equity cushion of
21       $21,000 despite fact that debtor lacked equity in the property.].  *** **The purpose
         of adequate protection under § 361 is to insure that the secured creditor
22       receives in value essentially what he bargained for, not a windfall.**
             The bankruptcy court's finding that there was inadequate protection for the sellers'
23       secured interest was clearly erroneous.

24   Id. at 1401 (emphasis added) (citations omitted in part).

25       In In re Boulders On The River, Inc., 164 B.R. 99 (9th Cir. BAP 1994) the Ninth Circuit

26

27

28

Bankruptcy Appellate Panel found that an equity cushion of **11.45%** constituted adequate protection. <u>Boulders</u>, 164 B.R. at 104 ("we find Pacific was adequately protected with a cushion of 11.45%."). *See also, e.g.* <u>In re Boodrow</u>, 126 F.3d 43, 53 (2d Cir. 1997) (equity cushion of 10% constitutes adequate protection); <u>In re Kendall</u>, 2005 WL 2293573, *1 (Bankr.C.D.Ill. 2005) (Lender's interest was adequately protected by "the equity cushion of ten percent."); <u>In re Dynaco Corp.</u>, 162 B.R. 389, 398 (Bankr.D.N.H. 1993) (equity cushion of approximately 17 % is adequate protection); <u>In re Helionetics</u>, 70 B.R. 433 (Bankr.C.D.Cal. 1987) (20.4% is adequate; <u>In re Hawaiian Pacific Industries</u>, 17 B.R. 670 (Bankr. D.Ha. 1982) (15% is adequate; <u>In re Rogers Development Corp.</u>, 2 B.R. 679 (Bankr. E.D.Va. 1980) (17% is adequate); <u>In re Pitts</u>, 2 B.R. 476 (Bankr.C.D.Cal.1979) (15% is adequate; <u>In re McGowan</u>, 6 B.R. 241, 243 (Bankr. E.D.Pa. 1980) (holding a 10% equity cushion is sufficient to be adequate protection); <u>In re Schlichter</u>, 22 B.R. 666 (Bankr.E.D.Pa.1982) (12% was found sufficient); <u>In re Carson</u>, 34 B.R. 502, 506 (D.Kan. 1983) (equity cushion of $138,600.00 or 11% was adequate).

Here, as set forth above, the Debtors anticipate that they will seek to sell substantially all of their assets pursuant to a sale under Section 363 of the Bankruptcy Code. The Debtors have been in negotiations with multiple potential purchasers of the Debtors' assets, and remains in the process of selecting a stalking horse bidder. The Debtors have received purchaser offers for their assets in amounts well in excess of the balance owing to the Bank.[4] The Debtors anticipate there

---

[4] Purchase and sale offers can constitute admissible evidence of the value of property. *See* <u>50-Off Stores, Inc. v. Banques Paribas (Suisse), S.A.</u>, 180 F.3d 247, 255 (5th Cir. 1999) ("an offer from another legitimate buyer" admitted as evidence of value of stock); <u>Ainsley Corp. v. C.I.R.</u>, 332 F.2d 555, 558 (9th Cir. 1964) ("In an eminent domain case in which the owner has, at a time not too remote from the taking, offered to sell the property in question for less than the amount which he is claiming, the offer is evidence of value which is admissible against his claim."); <u>Allison v. Ticor Title Ins. Co.</u>, 979 F.2d 1187, 1198 (7th Cir. 1993) ("offers of purchase of the lodge were relevant to the fair market value of the individual leases"); <u>Defiance Button Machine Co. v. C & C Metal Products Corp.</u>, 759 F.2d 1053, 1061 (2d Cir. 1985) ("value of the company's goodwill and of the mark symbolizing it may well be evidenced by C & C's offer to purchase"); <u>In re Marathon Foundry & Mach. Co.</u>, 239 F.2d 122, 128 (7th Cir. 1957) ("offer … made to purchase shares" of stock admitted as evidence of value); <u>Muller v. S. Pac. B. Ry. Co.</u>, 83 Cal. 240, 243, 23 P. 265, 266 (1890) ("The testimony of Muller as to offers made for the purchase of the lot of land above mentioned not taken was admissible to prove its value…"); <u>In re Fund Raiser Products Co., Inc.</u>, 163 B.R. 744, 751 (Bankr.E.D.Pa. 1994) ("offer to repurchase the shares for $150,000 is therefore the best benchmark of its value. The Court agrees."); <u>In re M.J. Shoearama, Inc.</u>, 137 B.R. 182, 190 (Bankr.W.D.Pa. 1990) ("The most reliable evidence as to the value of the property in the store is the offer made to the former trustee"); <u>In re Asheville Building Associates</u>, 93 B.R. 918, 919 (Bankr W.D.N.C. 1988) (court considered "the best evidence of the value of the building to be the recent offer to purchase the building."); <u>In re Newman</u>, 59 B.R. 670, 674 (Bankr.E.D.Mo. 1986) ("(T)he offer to purchase the ... property was properly admitted ... as evidence of what the value was."); <u>Caten v. Salt City Movers & Storage Co.</u>, 149 F.2d 428, 433 (2nd Cir. 1945) (offer letter was evidence of value); <u>Heiner v. Crosby</u>, 24 F.2d 191, 193 (3rd Cir. 1928) (Good faith offers are admissible to show fair value of stock); <u>Muller v. Southern Pacific B. Ry. Co.</u>, 83 Cal. 240, 243

1  will be a robust auction, and thus the ultimate sale price will substantially exceed a 20% equity

2  cushion. Accordingly, even assuming *arguendo* that the Bank had not consented to the

3  transaction with FMP, the Bank is adequately protected by an equity cushion.

### V.

### CONCLUSION

6  Based upon the foregoing, the Debtors respectfully request that this Court enter its order:

7  (i) authorizing the Debtors to enter into that certain supply agreement with FMP pursuant to 11

8  U.S.C. § 363(b), and (ii) to obtain credit from FMP in connection therewith, pursuant to 11 U.S.C.

9  § 364(d). In the alternative, to the extent the Debtors are able to negotiate financing with another

10  party on superior terms on or before the hearing, and subject to the consent of the Bank, the

11  Debtors reserve the right to seek approval of such alternative transaction.

12  DATED: January 15, 2016                    **WINTHROP COUCHOT**
13                                             **PROFESSIONAL CORPORATION**

14                                             By:   */s/ Garrick A. Hollander*
15                                                   Garrick A. Hollander
                                                     Peter W. Lianides
16                                                   Jeannie Kim
17                                             [Proposed] General Insolvency Counsel for
                                               Debtor and Debtor-in-Possession

27  (1890) ("Bona fide offers for property afford some test as to its value, and are, we think, admissible."); Maine-New
28  Hampshire Interstate Bridge Authority v Ham's Estate , 92 N.H. 277, 30 A.2d 7, 11 (1943) (both accepted and unaccepted
    offers "are admissible to show value.")

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4th Floor, Newport Beach, CA 92660.

A true and correct copy of the foregoing document entitled: **DEBTOR'S <u>EMERGENCY</u> MOTION FOR ORDER AUTHORIZING DEBTOR TO ENTER INTO SUPPLY AGREEMENT PURSUANT TO 11 U.S.C. § 363(b), AND TO OBTAIN CREDIT PURSUAN TO 11 U.S.C. § 364(d); MEMORANDUM OF POINTS AND AUTHORITIES** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On January 15, 2016, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2. <u>SERVED BY UNITED STATES MAIL</u>**: On _____, 2016, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3. <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL</u>** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on January 15, 2016, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Via Overnight Delivery Service
Honorable Wayne Johnson
3420 Twelfth St., Suite 384
Riverside, CA 92501-3819

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 15, 2016 | Melody Conour | /s/ Melody Conour |
|---|---|---|
| Date | Printed Name | Signature |

## NEF SERVICE LIST

- Harold L Collins    halc@knfilters.com, hcollinslaw@aol.com
- Abram Feuerstein    abram.s.feuerstein@usdoj.gov
- Everett L Green    everett.l.green@usdoj.gov
- James A Hayes    jhayes@jamesahayesaplc.com
- Gregory K Jones    GJones@dykema.com, CPerez@dykema.com
- Teddy M Kapur    tkapur@pszjlaw.com
- Mette H Kurth    mkurth@foxrothschild.com, pchlum@foxrothschild.com
- Alan I Nahmias    anahmias@mbnlawyers.com, jdale@mirmanbubman.com
- Samuel A Newman    snewman@gibsondunn.com
- Daniel H Reiss    dhr@lnbyb.com, dhr@ecf.inforuptcy.com
- Mohammad Tehrani    Mohammad.V.Tehrani@usdoj.gov
- United States Trustee (RS)    ustpregion16.rs.ecf@usdoj.gov

## SERVICE VIA OVERNIGHT
### (Unless NEF indicated)

| | | |
|---|---|---|
| Metropolitan Automotive<br>Attn:  Ron Turner, President<br>535 Tennis Court Lane<br>San Bernardino, CA 92408 | United States Trustee    NEF<br>Everett Green, Esq.<br>3801 University Ave., #720<br>Riverside, CA 92501 | MetroAuto<br>SpecialNotice20Largest, Etc.<br>Document No. 216197 |
| NEF1/7/16<br>James Spencer<br>c/o James A. Hayes, Jr., Esq.<br>1 Park Plaza, Suite 600<br>Irvine, CA 92614 | William B. Freeman, Esq.<br>Katten Muchin Rosenman LLP<br>Atty for Bank of the West<br>515 S. Flower St., #1000<br>Los Angeles, CA 90071 | Federal Mogol Motorparts<br>c/o Thomas Lauria, Esq.<br>White & Case<br>1155 Avenue of the Americas<br>New York, NY 10036-2787 |
| Alameda Co. Tax Collector<br>1221 Oak St.<br>Oakland, CA 93612 | Secd<br>Employment Dev. Dept.<br>Bankruptcy Group MIC 92E<br>PO Box 826880<br>Sacramento, CA 94280-0001 | Franchise Tax  Board<br>Bankrptcy Section MS:  A-340<br>PO Box 2952<br>Sacramento, CA 95812-2952 |
| Fresno County Tax Collector<br>2281 Tulare St.<br>Fresno, CA 93712 | Internal Revenue Service<br>PO Box 7346<br>Philadelphia, PA 19101-7346 | Los Angeles County Tax Collector<br>PO Box 54110<br>Los Angeles, CA 90054 |
| San Bernardino County Tax<br>Collector<br>172 West Third St.<br>San Bernardino, CA 92415 | San Diego County Tax Collector<br>162 County Admin Center<br>1600 Pacific Highway<br>San Diego, CA 92101 | State Board of Equalization<br>Sp. Operations, Bkcy Team, MIC:74<br>PO Box 942879<br>Sacramento, CA 94279-0074 |

State Board of Equalization
Acct. Information Group, MIC:29
PO Box 942879
Sacramento, CA 94279-0029

R&B Inc. (Dorman Products, Inc.)
PO BOX 8500 S-4565
Philadelphia, PA 19178

Federal Mogul Corp.
PO BOX 636438
Cincinnati, OH 45263-6438

Standard Motor Products
93307 Network Place
Chicago, IL 60673-1933

Motorcar Parts Of America
2929 California Street
Torrance, CA 90503

Dayco Products, LLC
PO BOX 847331
Dallas, TX 75284

Monroe Auto Equip Co.
PO BOX 98990
Chicago, IL 60693

Cardone Industries
PO BOX 827267
Philadelphia, PA 19182

East Penn Mfg. Co. Inc.
102 Deka Road
Lyon Station, PA 19536-0147

Denso Products & Services
PO BOX 601009
Pasadena, CA 91189

Four Seasons
88207 Expedite Way
Chicago, IL 60695-0001

Advanced Innovative Technology
2830 N. Oak Grove Ave.
Springfield, MO 65803

Robert Bosch LLC Sales Group
PO BOX 95092
Chicago, IL 60694-5092

Airtex Products LP
PO BOX 60198
Saint Louis, MO 63160

Spectra Premium Inds.
8774 S State Rd 109
Knightstown, IN 46148

IAP West Inc.
20036 Via Baron
Compton, CA 90220

Centric Parts Industry
14528 Bonell St
City of Industry, CA 91746-301

Schaeffler Group USA Inc.
15290 Collections CTR Dr
Chicago, IL 60693

Wix Filtration Corp
1 Wix Way
Gastonia, NC 28053

KYB Americas Corp
7868 Solution Center
Chicago, IL 60677

Secd

GMB North America
100 Herrod Blvd
Dayton, NJ 08810

CWD, LLC; dba Centric Parts,
Stoptech, Powerslot,
WDSource.Com
14528 Bonelli St.
City of Industry, CA 91746-3022

Wells Fargo Bank N.A.
300 Tri State Intl, #400
Lincolnshire, IL 60069-4417

Motorcar Parts of America, Inc.
Attn:  Corporate Officer
2929 California Street
Torrance, CA 9053

Flex Financing
Attn:  Corporate Officer
PO Box 15270
Irvine, CA 92623

Bank of the West
2527 Camino Ramon
San Ramon, CA 94583

TCF Equipment Finance Inc.
Attn:  Corporate Officer
11100 Wayzata Blvd., #801
Hopkins, MN 55305

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jules and Associates, Inc.
Attn:  Corporate Officer
515 S. Figueroa St., #1950
Los Angeles, CA 90071-3312

**LITIGATION**

Attorneys for Plaintiffs Jose Nativdad
Hernandez and Abel Mejia
Jack D. Josephson, Esq.
Law Offices of Jack D. Josephson, APC
3580 Wilshire Blvd. Suite 1260
Los Angeles, CA 90010

GreatAmerica Leasing Corp.
Attn:  Corporate Officer
PO Box 609
Cedar Rapids, IA 52406

**LITIGATION**

Attorneys for Plaintiffs Jose Natividad
Hernandez and Abel Mejia
Yameen Salahuddin, Esq.
Rawa Law Group, APC
5843 Pine Ave., Suite A
Chino Hills, CA 91709

Bank of the West, Trinity Divison
475 Sansome St., #19
San Francisco, CA 94111